Heather **PIRKOV–MIDDAUGH, a minor By and Through her parent and natural guardian, Linda MIDDAUGH, Respondents,**

v.

**GILLETTE CHILDREN'S HOSPITAL, Appellant,**

**P. Cederberg, M.D., et al., Defendants,**

**K. Vanden Brink, M.D., Respondent,**

**and**

**State of Minnesota, Intervenor, Respondent.**

No. C9–91–526.

Court of Appeals of Minnesota.

Dec. 17, 1991.

Review Granted March 10, 1992.

Steven D. Emmings, John W. Carey, Sieben, Grose, Von Holtum, McCoy & Carey, Ltd., Fairfax, Law Offices of Keith G. Ondrasek, Chilton, Wis., for Heather Pirkov–Middaugh, et al.

Kenneth P. Gleason, Dawn G. Atchison, Victor E. Lund, Mahoney, Dougherty & Mahoney, Minneapolis, for Gillette Children's Hosp.

David D. Alsop, Anne T. Johnson, Gislason, Dosland, Hunter & Malecki, Minnetonka, for K. Vanden Brink, M.D.

Hubert H. Humphrey, III, Atty. Gen., Mary Ann Bernard, Sp. Asst. Atty. Gen., St. Paul, for State.

Considered and decided by DAVIES, P.J., and PARKER and FOLEY *, JJ.

## OPINION

DANIEL F. FOLEY, Judge.

Respondent Heather Pirkov–Middaugh and her mother, respondent Linda Middaugh, were awarded damages by a jury in a medical malpractice lawsuit arising from Heather's surgery at appellant Gillette Children's Hospital. Respondent the State of Minnesota contends it has no liability under Minn.Stat. § 3.736, subd. 1 (1982). The State and Gillette argue that, because of Gillette's insurer's subsequent insolvency, Gillette's procurement of insurance did not operate as a Minn.Stat. § 3.736, subd. 8 (1982) waiver of the defense of governmental immunity to the extent of the policy limits for liability exceeding the statutory caps in Minn.Stat. § 3.736, subd. 4 (1982). Challenge also is made to the sufficiency of

the evidence, the trial court's submission to the jury of the fault of Gillette's medical director for whom summary judgment of dismissal had previously been entered, and the assignment of his fault to Gillette. We affirm.

## FACTS

This lawsuit arises out of complications suffered by Heather, then age four, when she underwent hip surgery. Heather developed "compartment syndrome" after the surgery. Compartment syndrome is an excruciating and devastating complication that can result in death of tissue and may necessitate amputation.

The muscles in the lower leg are contained within four compartments that are enclosed by restrictive tissue called fascia. In compartment syndrome, the muscles swell beyond the capacity of the fascia, and blood circulation is shut off. Damage can be prevented, however, by making incisions in the fascia to allow the muscle to bulge out. This procedure is called a fasciotomy.

As a result of compartment syndrome, Heather's right leg was damaged. The muscles in Heather's lower right leg had to be surgically removed because the muscle tissue had died. Her right lower leg is like a stick she can walk on, but it does not function normally.

On Thursday, July 14, 1983, Dr. Cederberg performed the hip surgery on Heather at Gillette. Dr. Cederberg called the hospital early the next morning, on Friday, July 15, to check on Heather's condition. He did not talk to any other doctors. Dr. Sundberg also saw Heather that day. He left town on Saturday for ten days. On Saturday, July 16, Heather was seen by Dr. Schneider. Dr. Schneider was not told Dr. Cederberg was inaccessible by telephone over the weekend. Dr. Schneider tried to reach Dr. Cederberg without success.

Dr. Schneider contacted the medical director of Gillette, Dr. Vanden Brink, on Saturday evening. Dr. Vanden Brink gave Dr. Schneider instructions on how to treat

* Retired judge of the Court of Appeals, acting by appointment pursuant to Minn. Const. art. VI, § 2.

Heather. Later Saturday night, Dr. Vanden Brink performed an emergency fasciotomy on Heather.

This lawsuit was commenced on July 5, 1985. On August 3, 1990, summary judgment was entered dismissing Dr. Vanden Brink from the lawsuit and finding Drs. Cederberg, Schneider, Sundberg and Lutter were independent contractors and not employees of Gillette. Drs. Cederberg, Schneider and Sundberg settled with respondents Pirkov–Middaugh prior to trial. Dr. Lutter was dismissed during the trial.

On September 11 through October 10, 1990, a jury trial was held. The jury rendered a special verdict apportioning fault: 43% to Cederberg, 10% to Schneider, 7% to Vanden Brink and 40% to Gillette. Judgment was later entered against Gillette for 47% of the verdict ($347,800), preverdict interest ($145,250), and costs and disbursements.

The trial court filed an order on January 4, 1991, giving the State leave to intervene on appeal solely on the issues in the State's proposed answer dated November 30, 1990. On March 29, 1991, Gillette filed a notice of appeal. On April 12, 1991, the State filed a notice of review.

## ISSUES

1. In 1983, was Gillette Children's Hospital the "state" within the meaning of Minn.Stat. § 3.732, subd. 1(1) (1982) and Minn.Stat. § 3.736, subd. 1 (1982)?

2. Was Gillette's private incorporation under authority of chapter 599, 1988 Minnesota Laws, also governed by Minn. Stat. § 250.05, subd. 8 (Supp.1987)?

3. Did the legislature intend to repudiate the State's prior undertaking of section 3.736 liability by retroactive application of Minn.Stat. § 15.082 (1990)?

4. Did Gillette's procurement of liability insurance waive the liability caps in section 3.736 to the extent of the policy limits even though the insurer subsequently became insolvent?

5. Was the evidence sufficient to support the jury's findings?

6. Did the trial court err in submitting to the jury the fault of Gillette's medical director and assigning his fault to Gillette?

## ANALYSIS

■ 1. At the time of Heather's surgery, Minnesota Statutes provided that the state agreed to

pay compensation for injury to or loss of property or personal injury or death caused by an act or omission of any employee of the state while acting within the scope of his office or employment, under circumstances where the state, if a private person, would be liable to the claimant.

Minn.Stat. § 3.736, subd. 1. Minn.Stat. § 3.732, subd. 1(1) defined the "state" to include:

each of the departments, boards, agencies, commissions and officers in the executive branch of the state of Minnesota and includes but is not limited to the Minnesota Housing Finance Agency, the Minnesota Higher Education Coordinating Board, the Minnesota Higher Education Facilities Authority, the Armory Building Commission, the State Zoological Board, the University of Minnesota, state universities, community colleges, state hospitals, and state penal institutions.

The State contends it has no liability under Minn.Stat. § 3.736, subd. 1. The State argues Gillette was not a state entity as defined in Minn.Stat. § 3.732, subd. 1. We disagree.

The State acknowledges the section 3.732 list of "state" organizations is expressly not exclusive. Nonetheless, the State argues we should narrowly construe Minn. Stat. § 3.732, subd. 1(1). *See* Minn.Stat. § 645.27 (1982) (state not bound by a statute if not named therein or absent clear intention to be bound). We disagree with the State such a narrow construction requires Gillette be listed in section 3.732 or that there be an express acknowledgement of section 3.736 liability in the laws governing Gillette's existence.

The State also maintains the legislature intended to repudiate liability for Gillette in

1973 by making Gillette a public corporation in the executive branch. *See* Minn. Stat. § 250.05, subd. 1 (1973) (establishing a hospital authority "as a public corporation in the executive branch of state government and a political subdivision of the state"). Such an intention is belied, however, by the fact that, two years later, the legislature listed Gillette when the revisor of statutes was directed to rename state agencies. *See* 1975 Minn.Laws ch. 271, § 6. At that time, Gillette was specifically called a state agency. *See* 1975 Minn. Laws ch. 271, § 3(9).

Furthermore, Gillette employees remained state employees. Minn.Stat. § 250.01 (1971), repealed in 1973, first established Gillette as a state hospital. When section 250.01 was repealed, Gillette was made a public corporation and hospital authority. *See* Minn.Stat. § 250.05, subd. 1 (1973). At the same time, section 250.05, subdivision 3 (1973) was enacted. It provided:

> All employees of the Gillette children's hospital who are in the classified service of the state on May 24, 1973 shall be continued as employees of the authority without loss of status, seniority, or benefits. * * * All other employees of the authority shall be in the unclassified service.

Minn.Stat. § 250.05, subd. 3 (1973).

This remained the law at the time of Heather's surgery. *See* Minn.Stat. § 250.-05, subd. 3a (1982). It was not until 1988, when legislation was enacted allowing Gillette to privately incorporate, that the legislature provided new employees of the nonprofit corporation would not be state employees. *See* 1988 Minn.Laws ch. 599, § 2.

We also are unpersuaded by the State's contention Gillette fell within the specific exclusion of local governmental units in Minn.Stat. § 3.732, subd. 1(1). Minn.Stat. § 3.732, subd. 1(1) provided that the definition of "state" did not

> include a city, town, county, school district, or other local governmental body corporate and politic.

The State argues Gillette fell within the local governmental exclusion because Gillette was designated as a public corporation and a political subdivision.

Gillette may have been a public corporation, but it was within the executive branch of the state. The exclusionary language in section 3.732 expressly refers to *local* corporate and politic bodies. A public corporation in the executive branch of the state is not a *local* body. Additionally, Gillette was not designated a political subdivision at the time of Heather's surgery and has never been referred to as a *local* political subdivision. *See* 1978 Minn.Laws ch. 715, § 1 (repealing 1973 political subdivision designation in Minn.Stat. § 250.05, subd. 1).

The State's construction is contrary to a plain reading of the statutes. Therefore, we do not address the State's public policy arguments. We hold that Gillette was a state entity under section 3.732 at the time of Heather's surgery, and that the State agreed, in 1983, to pay compensation for injuries caused by the acts or omissions of Gillette's employees under section 3.736.

■ 2. Gillette privately incorporated in 1989 pursuant to 1988 legislation. *See* 1988 Minn.Laws ch. 599 (allowing Gillette to privately incorporate and keep the public corporation's personal property). The State contends the private incorporation "dissolved" the public corporation and a dissolution of the public corporation was governed by Minn.Stat. § 250.05, subd. 8. That law provided:

> *In the event of dissolution of the Gillette Children's Hospital,* no liquidating or other dividends shall be declared or paid to any private individual and the net assets of Gillette Children's Hospital shall be distributed as follows:
>
> (1) *all liabilities and obligations of the Gillette Children's Hospital shall be paid, satisfied, or discharged, or adequate provisions shall be made to do so.*
>
> (2) remaining assets shall be distributed to the state of Minnesota or public, charitable, scientific, or educational organizations.

Minn.Stat. § 250.05, subd. 8 (emphasis added).

Gillette argues subdivision 8(1) did not come into play unless Gillette elected to go out of existence. We agree.

The 1987 act did not speak of a dissolution of the public corporation; it said *Gillette* could be dissolved. It is clear "dissolved" referred to the hospital ceasing to exist at all, not just ceasing to be a public corporation. This is borne out by the provisions for distributions of assets. Furthermore, the 1988 act provided the public corporation would cease to exist when Gillette incorporated privately. It did not say the public corporation would be "dissolved."

Gillette could either distribute its assets and go out of existence under the 1987 law, or it could become a private corporation under the 1988 law. Gillette privately incorporated. It did not dissolve.

We have determined the private incorporation of Gillette under authority of Chapter 599, 1988 Minnesota Laws was not governed by Minn.Stat. § 250.05, subd. 8 (Supp.1987). Accordingly, we need not decide whether prior liability under section 3.736 would have been repudiated by Minn. Stat. § 250.05, subd. 8.

3. The State contends section 3.736 liability was repudiated by Minn.Stat. § 15.-082. Minn.Stat. § 15.082 provides:

Notwithstanding any other law, the state is not liable for obligations of a public corporation created by statute.

■ As a general rule, a statute is not given retroactive construction without a clear showing of intent by the legislature. Minn.Stat. § 645.21 (1990). We do not reach whether section 15.082 negates section 3.736 indemnification of state entities that are also public corporations because section 15.082 was not made retroactive by the legislature. *See* 1990 Minn.Laws ch. 594, art. 1, §§ 41, 82. We hold, therefore, that the legislature did not intend to repudiate any prior undertaking of section 3.736 liability for Gillette.

■ 4. In 1983, Gillette purchased liability insurance from Horizon Insurance Company with limits of $1,000,000 per occurrence. On July 1, 1983, Great Global Insurance Company assumed obligation on the liability insurance policy in favor of Gillette. On February 19, 1986, Great Global was found insolvent. Gillette's defense was assumed by Minnesota Insurance Guarantee Association under Minn. Stat. § 60C.05.

Gillette argues that, even if it was a section 3.732 state entity, its procurement of insurance did not waive the statutory liability caps to the extent of the insurance limits because of the subsequent insolvency of Gillette's insurer.

Minn.Stat. § 3.736, subd. 8 (1982) provided:

A state agency, including an entity defined as part of the state in section 3.732, subdivision 1, clause (1), may procure insurance against liability of the agency and its employees for damages resulting from the torts of the agency and its employees. The procurement of this insurance constitutes a waiver of the defense of governmental immunity to the extent of the liability *stated in the policy*, but has no effect on the liability of the agency and its employees beyond the coverage so provided.

(Emphasis added).

■ We agree with the trial court that Gillette waived the statutory caps on liability found in Minn.Stat. § 3.736, subd. 4. A waiver is the voluntary relinquishment of a known right that cannot be reclaimed without consent. *Meagher v. Kavli*, 251 Minn. 477, 486–87, 88 N.W.2d 871, 878–79 (Minn. 1958). Gillette had constructive notice of Minn.Stat. § 3.736, subd. 8. *See id.* (constructive knowledge can support a finding of waiver). We hold the defense of governmental immunity was waived to the extent of insurance coverage "stated in the policy" obtained by Gillette even though not actually available to Gillette because of the insurer's insolvency. *See Horace Mann Ins. Co. v. Independent School Dist. No. 656*, 355 N.W.2d 413, 420–21 (Minn.1984) (an attempt to obtain liability insurance waived governmental immunity defense to the extent of the policy limits).

■ 5. Gillette challenges the sufficiency of the evidence supporting its fault. A

reviewing court has a limited role in reviewing jury verdicts. *Stuempges v. Parke Davis & Co.*, 297 N.W.2d 252, 256 (Minn.1980).

> All testimony must be considered in the light most favorable to the prevailing party, * * * and a verdict will only be disturbed if it is "manifestly and palpably contrary to the evidence." * * * Review is even more limited when the jury verdict must consider the demeanor of the witnesses.

*Id.* (citations omitted).

The jury heard evidence Gillette's nursing staff was not appropriately monitoring Heather's condition. There also was evidence the Gillette staff did not obtain equipment needed to test for compartment syndrome quickly enough. The jury heard that the nurses did not know what equipment was needed and that neither the nurses nor the doctor knew where the equipment was located. Furthermore, emergency surgery was ordered at 8:00 p.m. and was not done until 11:00 p.m. The evidence is sufficient to support the verdict.

6. Prior to trial, summary judgment was granted in Dr. Vanden Brink's favor. During trial, the other defendants introduced evidence of Dr. Vanden Brink's negligence. The trial court, noting the summary judgment was interlocutory, submitted Vanden Brink's fault to the jury. The jury found him 7% at fault and the trial court assigned that fault to Gillette.

There is no dispute that Dr. Vanden Brink's negligence could be submitted to the jury even though he was no longer a defendant. *See Frey v. Snelgrove*, 269 N.W.2d 918, 923 (Minn.1978) (trial court should submit fault of parties to the jury even if they have been dismissed). Gillette contends, however, that assigning Dr. Vanden Brink's fault to it was barred by res judicata. We disagree.

The summary judgment dismissing Dr. Vanden Brink was based on his immunity as an administrator of the hospital. At trial, the evidence tended to show Dr. Vanden Brink was negligent and his negligence was in the course of his assumption of attending physician responsibility as part of his duties as medical director. The trial court properly allowed Heather and her mother to amend their pleadings to conform to the evidence Gillette was liable for negligence of Dr. Vanden Brink. *See* Minn.R.Civ.P. 15.02 (allowing amendment of the pleadings to conform to the evidence).

We hold the trial court did not err in submitting Dr. Vanden Brink's fault to the jury and assigning it to Gillette.

### DECISION

Affirmed.